PD-0308-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/22/2015 3:40:06 PM
Accepted 4/23/2015 9:59:49 AM
ABEL ACOSTA
CLERK

# PD No. 0308-15

## COA No. 02-13-00582-CR

## COURT OF CRIMINAL APPEALS OF TEXAS

**Ex parte Byrias Roberson,**
*Petitioner- Appellant,*

## APPELLANT'S
## PETITION FOR DISCRETIONARY REVIEW

MARK BRILEY #24069418
ASSISTANT PUBLIC DEFENDER
Mark.Briley@co.wichita.tx.us

600 Scott Avenue, Suite 204
Wichita Falls, Texas 76301
Phone 940-766-8199
Fax 940-716-8561

FILED IN
COURT OF CRIMINAL APPEALS

April 23, 2015

ABEL ACOSTA, CLERK

# Identity of Parties

County Court at Law Number 1 of Wichita County, Texas:
 The Honorable Gary Butler
 900 7th Street, Suite 201
 Wichita Falls, Texas 76301
 940-766-8107
 940-766-8156 fax

Appellant:
 Byrias Roberson

 Mark Briley
 Assistant Public Defender
 Attorney for Appellant, Byrias Roberson
 600 Scott, Suite 204
 Wichita Falls, Texas 76301
 940-766-8199
 940-716-8561 fax

State of Texas:
 Lori Johnston
 Assistant District Attorney
 Attorney for the State
 900 7th Street, Room 351
 Wichita Falls, Texas 76301
 940-766-8113
 940-716-8530 fax

# Table of Contents

Identity of Parties ................................................................ii

Index of Authorities.................................................................v

Statement Regarding Oral Argument ...........................................vii

Statement of the Case................................................................vii

Statement of Procedural History ...............................................vii

Questions Presented for Review ...............................................viii

Argument.................................................................................1
1. Facts ...................................................................................1
2. Double Jeopardy .................................................................2
3. Ex Parte Lewis criticisms of Bauder.....................................4
3.1 No historical analysis of Texas Constitution............................4
3.2 Recklessness standard is too confusing ................................8
4. Reckless standard strikes a better balance ...............................10
4.1 Protects Defendant's rights...................................................10
4.1.1 Specific intent is difficult to prove .....................................11
4.1.2 But Defendant's consent/control should be the issue not the State's intent .............................................................................11
4.2 Reckless standard does not over correct the balance/take away society's interest   ...................................................................13
5. Conclusion ..........................................................................14

Conclusion and Prayer for Relief .................................................16

Signature .................................................................................16

Certificate of Service .................................................................16

Certificate of Compliance ..................................................... 17

Contents of Appendix .......................................................... 17

Opinion of the Second Court of Appeals

Dissenting Opinion of the Second Court of Appeals

Exhibit A: Copy of Article 1 section 14 of the Texas Constitution as released by the Texas Legislative Council

Exhibit B: Copy of portions of the 1876 Texas Constitution printed in 1875 kept by the Tarleton Law Library

Exhibit C: Copy of portions of the 1876 Texas Constitution printed in 1876 kept in H.P.N. Gammel's collection of Texas laws

# Index of Authorities

**Cases:**

*Oregon v. Kennedy,*
    456 U.S. 667 (1982) .............................................. 2, 3, 7, 12, 13

*Bauder v. State,*
    921 S.W.2d 696 (Tex. Crim. App. 1996)............................. 3, 4

*Ex parte Lewis,*
    219 S.W.3d 335 (Tex. Crim. App. 2007)................. 4-10, 12-13

*Ex parte Peterson,*
    117 S.W.3d. 804 (Tex. Crim. App. 2003).................................. 8

*Ex parte Byrias Roberson,*
    2015 Tex. App. LEXIS 98 (Tex. App.—Ft. Worth Jan. 8,
2015) ................................................................................... 2, 14

**Constitutions and Statutes:**

Tex. Const. Art. 1 § 14 .................................................................. 5

Tex. Code Crim. Proc. art. 1.10 .................................................. 6

**Other Authorities:**

H.P.N. GAMMEL, THE LAWS OF TEXAS 1822-1897 VOLUME VIII
(H.P.N. Gammel ed., The Gammel Book Company) (1898) ............ 6

http://www.tlc.state.tx.us/tlc.htm ............................................... 5

http://www.statutes.legis.state.tx.us/ ......................................... 5

http://www.sll.texas.gov/law-legislation/texas/constitution/ ...........5

http://tarlton.law.utexas.edu/constitutions/texas1876/a1 ...............5

http://texashistory.unt.edu/ark:/67531/metapth6731/m1/785/
?q=783 .................................................................................6

## Statement Regarding Oral Argument

Mr. Roberson respectfully requests oral argument upon the important issue presented in this petition. Our Double Jeopardy rights are important to the integrity of the criminal justice system and the implementation and interpretation of this issue is crucial to the bench and bar of Texas.

## Statement of the Case

On August 22, 2013, County Court at Law Number 1 of Wichita County, Texas granted a mistrial on Appellant's motion. On November 13, 2013, that court denied Appellant's application for writ of habeas corpus requesting the court to bar retrial of the case. Appellant seeks appellate relief, claiming the State is barred from trying the case a second time.

## Statement of Procedural History

After the trial court denied Appellant's pretrial application for writ of habeas corpus, Appellant filed notice of appeal on November 25, 2013. The Second Court of Appeals issued an

opinion on January 8, 2015 affirming the trial court's decision.

Appellant then motioned the Second Court of Appeals for

rehearing on January 23, 2015. That motion for rehearing was

denied on February 19, 2015. This Court granted Appellant an

extension to file this petition and Appellant now timely files this

petition pursuant to that extension.

## Questions Presented for Review

**The court of appeals in affirming the denial of habeas relief, misapplied the intentional goading standard set forth in *Kennedy* in finding that the State did not engage in conduct with the intent to goad the Defense into requesting a mistrial.**

**In defense-requested mistrial settings, Texas should adopt a recklessness standard rather than the current intentional goading standard to better balance defendants' double jeopardy rights to have the first jury chosen decide a case with society's interest in prosecuting criminal accusations.**

## Argument

### 1. Facts

An investigator for the State approached a juror after the jury had been sworn. The investigator made an intentional conscious decision to approach an already-seated juror and engage in conversation prejudicial to the defendant, implying that the juror was on the prosecution's team because of the prosecution's efforts. According to the juror, in the conversation the investigator said, "'You were struck, but then we got you on' or something, or something to that effect."[1] Appellant requested a mistrial, stating "we have no choice at this point."[2] The trial court, believing there was no way the harm could be remedied and no other options, granted the mistrial.[3]

Since the mistrial, the State has filed *State's Notice of Intent to Introduce Extraneous Offenses and Bad Acts*, *State's Amended Notice of Intent to Introduce Extraneous Offenses and Bad Acts*,

---

[1] RR 4:6, line 10-12.
[2] RR 4:8, line 7-8.
[3] RR 4:9, line 15-18.

and *State's Second Amended Witness List and Designation of Expert Witnesses.*[4]

Also since the mistrial, Appellant's mother and witness to the allegation in question—unforeseen by the State and with little notice to Appellant—passed away on April 22, 2014.

## 2. Double Jeopardy

"The Double Jeopardy Clause [ . . . ] protects a criminal defendant from repeated prosecutions for the same offense."[5] It gives a defendant the "valued right" to have his trial completed by the first jury empaneled.[6] He has this valued right because a second prosecution "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance

---

[4] *See Ex parte Byrias Roberson*, 2015 Tex. App. LEXIS 98, at *17-18 (Tex. App.—Ft. Worth Jan. 8, 2015)(Dauphinot, J., dissenting)(discussing the State's lack of notice of bad acts and the State's anticipation of the use of testimony regarding certain bad acts).
[5] *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982).
[6] *Id.* at 671-73.

the risk tha[t] an innocent defendant may be convicted."[7] This right is balanced with society's interest in enforcing criminal laws.[8]

Appellant asks this Court to overturn the finding that the State in this case did not intend to goad Appellant into requesting a mistrial. Appellant also asks this Court to reconsider and again evaluate which court-created standard best balances Appellant's constitutionally created right against double jeopardy with society's interest in enforcing laws.

Considering the principles establishing our double jeopardy rights, the opinions of the United States Supreme Court and this Court in *Oregon v. Kennedy, Bauder v. State,* and *Ex Parte Lewis,* and the facts of this case, it would be unjust to allow the State to continue to prosecute this case. The State would be allowed to

[7] *Id.* at 682 (Powell, J., concurring)(quoting *Arizona v. Washington,* 434 U.S. 497, 503-505 (1978)); *see also Bauder v. State,* 921 S.W.2d 696, 698 (Tex. Crim. App. 1996)(stating that the Texas Double Jeopardy Clause also is meant to restrain the State from subjecting people accused from mental, emotional, and financial hardships associated with repeated trials).
[8] *Kennedy,* 456 U.S. at 672, 682; *Ex parte Lewis,* 219 S.W.3d 335, 369 (Tex. Crim. App. 2007).

engage in misconduct resulting in a mistrial, benefit from that misconduct, harm Appellant, and continue the harassment of Appellant associated with prosecutions.

Appellant asks this Court to overturn or modify *Ex Parte Lewis* and bar further prosecution of the present case.

### 3. *Ex Parte Lewis* criticisms of *Bauder*

*Bauder v. State* held that further prosecution is jeopardy barred after defense-requested mistrials not only when the prosecutor's objectionable conduct was intended to induce a mistrial but also when the prosecutor was aware but consciously disregarded the risk that his or her objectionable conduct would lead to a mistrial.[9] *Ex Parte Lewis* overruled *Bauder* and adopted the standard set out in *Oregon v. Kennedy*, requiring a showing that the governmental conduct intended to goad the defendant into moving for the mistrial.[10]

### 3.1 No historical analysis of Texas Constitution

---

[9] *Bauder v. State*, 921 S.W.2d at 699.
[10] *Lewis*, 219 S.W.3d at 371.

Both the majority opinion and the concurring opinion in

*Lewis* criticize *Bauder* for failing to undergo a historical analysis

in its opinion.[11] This complaint should not be a factor—in

overturning *Bauder* or deciding not to use a reckless standard—

for multiple reasons. First, much of *Lewis's* own historical analysis

should be reworked in light of the fact that it misquotes the Texas

Constitution when looking for the framers' intent.[12] It cites a

---

[11] *Lewis*, 219 S.W.3d at 354; *id.* at 372-73 (Cochran, J., concurring).

[12] *See id.* at 340, 346 (citing a comma to separate "liberty" and "nor").
"No person, for the same offense, shall be twice put in jeopardy of life or
liberty; nor shall a person be again put upon trial for the same offense after a
verdict of not guilty in a court of competent jurisdiction."
This is the language given for Article 1 section 14 of the Texas Constitution
by most sources. The punctuation between "liberty" and "nor" is sometimes
cited as a comma, for example in *Lewis*. West Publishing uses a comma,
which may be the reason for the discrepancy. LexisNexis uses the semicolon.
The paperback version of the Texas Constitution prepared by the Legal
Division of the Texas Legislative Council and published by the Texas
Legislative Council uses the semicolon. *See* Exhibit A. The website used by
the Texas Legislative Council uses the semicolon.
http://www.tlc.state.tx.us/tlc.htm; http://www.statutes.legis.state.tx.us/. The
Texas Legislative Council's website is also the one referred to by the Texas
State Law Library's website. http://www.sll.texas.gov/law-
legislation/texas/constitution/. The Tarleton Law Library has a collection of
Texas Constitutions from 1824-1876. The collection includes copies of The
1876 Texas Constitution, published at the time of its adoption. Its copy shows
that a semicolon is used. *See* Exhibit B;
http://tarlton.law.utexas.edu/constitutions/texas1876/a1. Also, H.P.N.

---

comma rather than a semicolon in article 1 section 14 to separate the clauses discussed.

Second, after *Lewis's* analysis, it reaches the same conclusions: that our double jeopardy rights apply in mistrial settings[13] and that defendants have a valued right to have the first chosen jury decide the case.[14] *Lewis* "acknowledges that an historical analysis [ . . . ] would not shed any light on the question."[15] It also states that alterations and differing text "suggest that the framers of the Texas Constitution did not simply

---

Gammel published *The Laws of Texas 1822-1897*, which includes a copy of the 1876 Constitution of the State of Texas. This copy uses the semicolon. H.P.N. GAMMEL, THE LAWS OF TEXAS 1822-1897 VOLUME VIII 779-783 (H.P.N. Gammel ed., The Gammel Book Company) (1898);Exhibit C. A copy of this book can be seen on The University of North Texas Library's website (through its Portal to Texas History link). http://texashistory.unt.edu/ark:/67531/metapth6731/m1/785/?q=783. This double jeopardy language is also repeated in Texas Code of Criminal Procedure, article 1.10. That language uses the semicolon (and adds a comma after "offense"). Tex. Code Crim. Proc. art. 1.10. Both West and Lexis use the same language and punctuation in article 1.10.

[13] *Lewis*, 219 S.W.3d at 353; *id.* at 377-78 (Price, J., dissenting).

[14] *Id.* at 353 (summarizing that barring retrial when a mistrial occurs without the defendant's consent and without manifest necessity protects defendants from multiple harassing prosecutions); *id.* at 377 (Price, J., dissenting).

[15] *Id.* at 378 (Price, J., dissenting); *see id.* at 354.

---

pattern the state double jeopardy provision after its federal counterpart but gave independent thought to its crafting."[16] Why not then, as the dissent asked, could *Bauder* decide for Texas under the Texas Constitution which standard best balances the defendant's rights against double jeopardy with society's interest in prosecuting cases?[17] *Kennedy* mentions that states are welcome to do so.[18]

Finally, a historical analysis was not needed in *Bauder* because it did not seek to establish, change, or even expand a constitutional right. Rather, it saw that the current standard (court-created standard) did not adequately protect that right. *Bauder* simply found that a recklessness standard better balanced our double jeopardy rights with society's interest in prosecuting cases. *Lewis* asks what should double jeopardy protect that is not

---

[16] *Id.* at 352.
[17] *Id.* at 377-78 (Price, J., dissenting)(calling *Bauder* a case of first impression in deciding the proper scope of Texas double jeopardy protections).
[18] *Kennedy*, 456 U.S. at 680 (Powell, J., concurring)(noting that Oregon state courts could come to a different conclusion).

---

already protected under *Oregon v. Kennedy*?[19] The right is the same: the right to have the first jury sworn decide a case to avoid increased burden and harm associated with multiple prosecutions. The question is: does the *Kennedy* standard adequately protect that right?

## 3.2 Recklessness standard is too confusing

*Lewis* concludes that the standard created by *Bauder* and refined by later courts is too confusing, creates practical difficulties, and that this Court has struggled to clarify it.[20] But as *Lewis's* dissent noted, whatever confusion *Bauder* may have created, this Court remedied in *Ex parte Peterson*.[21] *Peterson* set forth a three-pronged test:

(1) Did manifestly improper prosecutorial misconduct provoke the mistrial?

---

[19] *Lewis*, 219 S.W.3d at 370.

[20] *Id.* at 371.

[21] *Id.* at 383 (Price, J., dissenting); *see Ex parte Peterson*, 117 S.W.3d 804, 816-17 (Tex. Crim. App. 2003).

(2) Was the mistrial required because prejudice produced from that misconduct could not be cured by an instruction to disregard? and

(3) Did the prosecutor engage in that conduct with the intent to goad the defendant into requesting a mistrial (*Kennedy* standard) or with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial (*Bauder* standard)?

*Peterson's* standard is neither vague nor difficult to use. Recklessness is determined routinely by both juries and courts. Also, this standard is more objective than the *Kennedy* standard. *Lewis* (citing *Peterson*) claims that recklessness is no less subjective because both require courts to evaluate a mental state.[22] However, recklessly engaging in conduct that creates a substantial risk of a mistrial is much more objectively determined than specific intent (not whether a person intentionally engaged

---

[22] *Lewis*, 219 S.W.3d at 362.

in certain conduct—but what was their purpose in engaging in the conduct).

Specific intent is virtually impossible to prove because it can be easily masked as reckless behavior or even an honest mistake. (Even intentional conduct does not meet the standard). *Lewis* proudly found seven cases where the *Kennedy* standard was met.[23] These seven cases span from 1967-2007 (a 40-year span), and of these, two were cases where the State conceded the intent.[24] The remaining five include examples where the prosecutors' behavior was so obvious that they might as well have conceded intent.[25] Do these examples show that the *Kennedy* standard adequately protects our double jeopardy rights?

## 4. Reckless standard strikes a better balance

### 4.1 Protects Defendant's rights

---

[23] *Lewis*, 219 S.W.3d at 361.

[24] *Id.* at 361.

[25] *See id.* at 361(giving examples where the State neither seemed surprised by a mistrial motion nor argued against it). The example given in *Rademacher* was noteworthy because as in the current case, the State was surprised by in limine rulings regarding inadmissible testimony. *Id.* (citing *State v. Rademacher*, 433 N.W.2d 754 (Iowa1988)).

### 4.1.1 Specific intent is difficult to prove

A recklessness standard better protects double jeopardy rights in part because proving specific intent is virtually impossible *if* the State makes any effort at concealing their intentions. Adversarial gamesmanship, the want to win, and even improper prosecutorial methods exist—apparently some prosecutors even admit to it. But the *Lewis* standard relies on the hope that prosecutors who do intend to goad are either honest (right after committing misconduct) or do a very poor job at covering up their misconduct (and provide no "oops, honest mistake" excuse). And, if they do provide an honest alternative, the *Lewis* standard asks trial judges who work daily with these people not to give them the benefit of the doubt and instead call them liars. Although not impossible, the standard is virtually impossible to *prove*—even where the specific intent may exist.

### 4.1.2 But Defendant's consent/control should be the issue not the State's intent

Manifest necessity is the exception to a defendant's right to have the first jury selected decide a case. Unless he requests the mistrial, then he is thought to waive his right. Unless, says *Kennedy*, he didn't really consent, and his control was taken away from him.[26] "The important consideration, for purposes of the *Double Jeopardy Clause*, is that the defendant retain primary control over the course to be followed."[27]

*Lewis* reasons that:

> [t]o say the decision was not the defendant's own is to say that the decision was in reality made by someone else, e.g. the prosecutor. But when a prosecutor is merely reckless, one cannot say the prosecutor has made the decision to seek a mistrial. Only when the prosecutor intends to provoke the defendant's mistrial motion can it be said that the prosecutor, rather than the defendant, has exercised primary control over the decision to see the trial's termination.[28]

This logic does not hold. A drunk driver may not intend a result, but he can certainly take away my control over the course I wish

---

[26] *See Kennedy*, 456 U.S. at 671-73.

[27] *Id.* at 676 (citing *U.S. v. Dinitz*, 424 U.S. 600 (1976)); *see also Lewis*, 219 S.W.3d at 358 (stating that the issue is whether requesting a mistrial was ultimately the defendant's decision).

[28] *Lewis*, 219 S.W.3d at 358.

to follow. A prosecutor's reckless actions may create circumstances where a defendant has no choice but to request a mistrial.

## 4.2 Reckless standard does not over correct the balance/take away society's interest

"The State is entitled to one full and fair opportunity to present its evidence."[29] But the State must be responsible with that opportunity. Mistakes happen; prosecutors can be negligent. But when misconduct rises to the level of recklessness, the defendant's right to have the first jury determine his case should prevail. These two interests must be balanced[30] and both can be waived.

The *Peterson* standard—or one similar—allows prosecutors to make mistakes (negligence). It also maintains that mistrials are extreme remedies. Only where reckless or intentional conduct cannot be remedied should a mistrial be granted.

The current standard, however, allows the State to be reckless in the use of their (should be one) opportunity. It also

---

[29] *Id.* at 380 (Price, J., dissenting).
[30] *Kennedy*, 456 U.S. at 682.

allows competent prosecutors to mask intentional goading. And whether intentional or reckless, the financial and emotional hardships weigh more heavily on defendants.

## 5. Conclusion

Here, the record shows that the State did engage in conduct with the intent to cause a mistrial. As the dissenting opinion from the Second Court of Appeals accurately detailed, an experienced investigator would have only two reasons to tell a juror that she had been struck but that the State had managed to get her back on the jury: in an attempt to cause a mistrial or to deprive Appellant of a fair and impartial jury.[31] Because the State approached the trial court with the information and then benefitted from the mistrial, intent to goad must be found.

The State certainly took away all control from Appellant in which course to follow. Appellant had no choice but to make a motion for a mistrial; he did not consent to waiving his right to have the first jury decide this case. After the mistrial, the State

---

[31] *Ex parte Byrias Roberson*, 2015 Tex. App. LEXIS 98, at *27 (Tex. App.—Ft. Worth Jan. 8, 2015)(Dauphinot, J., dissenting).

has benefitted from additional time to give notice where they had chosen or failed to do so earlier. Appellant has been harmed—by the State's benefit, by increased financial and emotional hardships, by the additional time under this accusation, and by the passing of his mother who was a fact witness.

Appellant asks that this Court look to the State's behavior, its resulting benefit, and Appellant's harm and weigh Appellant's double jeopardy rights against society's interest in prosecuting this case. The State's behavior shows an intent to goad, however, our double jeopardy rights are better protected and better balanced under a reckless standard (whether under the *Peterson* standard or under a more finely tuned standard). Appellant asks this Court to bar further prosecution of this case.

## Conclusion and Prayer

The Court should GRANT this petition and permit the parties to brief the issue and then REVERSE this cause and REMAND the case to the court of appeals.

Respectfully submitted,

OFFICE OF THE PUBLIC DEFENDER
WICHITA COUNTY, TEXAS

_____

MARK BRILEY
ASSISTANT PUBLIC DEFENDER
SBOT # 24069418
600 Scott Avenue, Ste. 204
Wichita Falls, Texas 76301
(940) 766-8199
(940) 716-8561 fax

## Certificate of Service

On the 22nd day of April, 2015, a copy of the foregoing document was served upon opposing counsel.

_____

Mark Briley

## Certificate of Compliance

I certify according to Tex. R. App. P. 9.4 (i) (3) that this document contains 3459 words (excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes, which are in 12-point typeface, in making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

_Mark Briley_
Mark Briley

## Appendix

Opinion of the Second Court of Appeals

Dissenting Opinion of the Second Court of Appeals

Exhibit A: Copy of Article 1 section 14 of the Texas Constitution as released by the Texas Legislative Council

Exhibit B: Copy of portions of the 1876 Texas Constitution printed in 1875 kept by the Tarleton Law Library

Exhibit C: Copy of portions of the 1876 Texas Constitution printed in 1876 kept in H.P.N. Gammel's collection of Texas laws

Ex parte Roberson

NO. 02-13-00582-CR

COURT OF APPEALS OF TEXAS, SECOND DISTRICT, FORT WORTH

*2015 Tex. App. LEXIS 98*

January 8, 2015, Delivered
January 8, 2015, Opinion Filed

NOTICE:    PUBLISH

COUNSEL: FOR APPELLANT: MARK BRILEY, OFFICE OF THE PUBLIC DEFENDER WICHITA FALLS, TEXAS.

FOR STATE: MAUREEN SHELTON, DISTRICT ATTORNEY FOR WICHITA COUNTY WICHITA FALLS, TEXAS.

OPINION BY: ANNE GARDNER

## OPINION

Appellant Byrias Roberson appeals the denial of his pretrial application for writ of habeas corpus. Appellant contends the State goaded him into moving for a mistrial during his first trial and, therefore, any retrial would violate his protections against double jeopardy. We affirm.

## Background

In appellant's first trial for resisting arrest, the record shows that after the parties made their strikes, the jury was selected, the jury was sworn, the trial court excused the remaining veniremembers, the trial court gave instructions to the six jurors, the State read the indictment, appellant pled not guilty, and the trial court excused the jury despite the fact it was only about 3:00 p.m. and instructed the jurors to return the next morning. The record then resumes with the notation, "(Open court, defendant present, no jury)," [*2] and the prosecutor announced that the State's investigator, Donnie Cavinder, had "mistakenly" spoken to one of the jurors. The prosecutor stated that it was Cavinder, not a juror, who brought the matter to her attention. Cavinder was sworn in and testified that he left the courtroom before the jury was seated to run some equipment upstairs and, as he was coming back down, saw a person whom he believed to be Veniremember Fifteen. Cavinder explained that Veniremem-

ber Fifteen had already been released, so he decided to talk to her because she had commented during voir dire that she knew of him. Cavinder said the woman then corrected him by saying Veniremember Fifteen was someone else, and then it came up that the woman to whom he was speaking was the one who went to a game warden school. Cavinder said he then saw her badge by her right side and realized she was a juror. Cavinder denied discussing anything about the case. Although given an opportunity to cross-examine Cavinder, appellant declined. Ostensibly because the jurors had been excused, the trial court was not able to speak to the juror in question that day.

When the case resumed the next morning, the trial court questioned Veniremember [*3] Eight, who had become the third juror (Juror Number Three). She testified Cavinder just asked about her experience as a game warden. She added she thought Cavinder also made a comment to the effect, "You were struck, but then we got you on." She said she responded indifferently and told him she was going to leave. Juror Number Three continued, "[W]e stopped the conversation right there because he didn't realize that at [that] point I was a juror, a selected juror, I guess." Juror Number Three said she was wearing her juror badge on her purse.

Appellant thereafter moved for a mistrial. Appellant argued that regardless of what was actually said, he was left with no choice but to ask for a mistrial because the problem was that Cavinder said "we" got you on, and Juror Number Three was left with the impression that appellant did not want her on the panel whereas the State did. Appellant further stated, "[W]e're certainly not casting dispersions [sic] on Mr. Cavinder." When granting the mistrial, the trial judge said, "And I'm not casting fault on Investigator Cavinder at all. I understand that was an honest mistake. I completely believe that he believed he was speaking to [Veniremember Fifteen]." [*4]

A review of the record shows Veniremember Fifteen had indicated during voir dire that although she didn't

know Cavinder, she knew of him. The voir dire also shows Juror Number Three disclosed she went to a game warden academy. The record does not reflect when Cavinder left the courtroom.

Thereafter, appellant filed an application for writ of habeas corpus. Appellant contended the prosecution goaded him into requesting a mistrial. The State filed a bench brief in which it conceded Cavinder's conversation with Juror Number Three was inappropriate but asserted Cavinder's blunder was insufficient under the relevant standard to meet appellant's burden of showing the State intended to provoke him into moving for a mistrial.

At the hearing on appellant's application for writ of habeas corpus, which occurred approximately fifty days after the trial court granted the mistrial, appellant's wife testified that she was present when the previous jury was selected, and she maintained Cavinder did not leave the courtroom until the jurors left the courtroom. Her recollection was the other veniremembers left the courtroom ten to fifteen minutes before the jurors themselves left. She estimated five to [*5] ten minutes after the jurors left the courtroom, the prosecutor and Cavinder came back into the courtroom to alert the court about the conversation. Appellant again argued the State intended to goad him into moving for a mistrial. The State again argued Cavinder's conduct was the result of a mistake. The trial court denied appellant's application.

The parties do not dispute jeopardy attached at the first trial. Jeopardy attaches at the time the jury is empaneled and sworn. *State v. Blackshere, 344 S.W.3d 400, 404 (Tex. Crim. App. 2011)*. The parties also do not dispute the State was responsible for its investigator's actions. The investigative team's knowledge is imputed to the prosecutor. *Ex parte Adams, 768 S.W.2d 281, 291-92 (Tex. Crim. App. 1989)*.

### Standard of Review

"Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Oregon v. Kennedy, 456 U.S. 667, 676, 102 S. Ct. 2083, 2089, 72 L. Ed. 2d 416 (1982)*; *Ex parte Bennett, 245 S.W.3d 616, 618-19 (Tex. App.--Fort Worth 2008, pet. ref'd)*. "Under both the federal and state constitutions, retrial is barred only if the prosecutor intentionally caused a mistrial." *Bennett, 245 S.W.3d at 619*. When reviewing a trial court's decision to grant or deny habeas relief, appellate courts consider the evidence in the light most favorable to the trial court's ruling and should [*6] uphold the ruling absent an abuse of discretion. *Id. at 618*. The Court of Criminal Appeals has set out a nonexclusive list of objective factors to assist the

trial court when assessing the prosecutor's or its agent's state of mind: (1) Was the misconduct an attempt to abort a trial that was going badly for the State? Put another way, at the time the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal? (2) Was the misconduct repeated despite the trial court's admonitions? (3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct? (4) Was the conduct "clearly erroneous"? (5) Was there a legally or factually plausible basis for the conduct despite its impropriety? (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?[1] *See Ex parte Wheeler, 203 S.W.3d 317, 323-24 (Tex. Crim. App. 2006)*.

> 1 *Wheeler* referred to reckless or intentional misconduct. The Court of Criminal Appeals later limited double jeopardy relief to intentional conduct only. *Ex parte Lewis, 219 S.W.3d 335, 336-37, 371 (Tex Crim. App. 2007)*.

### Discussion and Application

To rule in appellant's favor, the trial court would have had to effectively find the evidence showed the following: (1) Cavinder deliberately [*7] spoke to Juror Number Three knowing she was a member of the jury; (2) Cavinder deliberately told Juror Number Three that appellant tried to have her struck but the State saved her for the purpose of prejudicing Juror Number Three against appellant; (3) rather than hide the improper influence, Cavinder then alerted the prosecutor of his improper conduct knowing the prosecutor would have to bring the matter to the trial court's attention; (4) Cavinder deliberately lied to the trial court about mistaking Juror Number Three for Veniremember Fifteen to mask the fact he was attempting to intentionally cause a mistrial; (5) Cavinder deliberately lied to the trial judge about when he left the courtroom notwithstanding the fact the trial judge, the prosecutor, and defense counsel were all likely present when he left the courtroom and could have easily caught him in the lie; (6) appellant's wife's recollection of Cavinder's presence or absence during voir dire approximately fifty days later was accurate; and (7) Cavinder did all this because it appeared appellant would likely obtain an acquittal. As evidenced by its ruling, the trial court declined to read the facts in this manner. For the reasons [*8] that follow, the record supports the trial court's decision to not construe the facts in appellant's favor.

**(1) Was the misconduct an attempt to abort a trial that was going badly for the State? Put another way, at the time the prosecutor acted, did it reasonably**

appear that the defendant would likely obtain an acquittal?

The trial court granted the mistrial before the State had presented a single witness. Appellant argued the State was trying to avoid an adverse pretrial ruling regarding the admission of extraneous bad acts. Appellant contended the State had not given timely notice for extraneous bad acts and needed the mistrial to delay the trial and thereby comply with the notice requirements. The record confirms appellant had requested notice of extraneous bad acts, and although the State provided a witness list and an amended witness list consisting exclusively of police officers, the State did not specifically respond to appellant's request for notice.

Regarding the adverse ruling, appellant filed a motion in limine regarding any allegations of extraneous bad acts. At the hearing on the motion in limine, the State said it anticipated testimony about the officers' entry into the [*9] home, and if appellant intended to challenge the legality of that entry, the State wanted an opportunity to question some of its witnesses about a prior disturbance during which appellant had barricaded himself and his family inside their home. The prosecutor said that testimony would go to the officers' ability to identify and recognize appellant, the officers' state of mind, the reason the gang task force was asked to serve the warrants, and the reason why the officers thought appellant lived in this particular residence. At this point, appellant pointed out to the judge that he had asked for notice of other bad acts and had not received any. The trial court responded by granting Appellant's motion in limine, by instructing the parties to approach him before starting with those witnesses to determine precisely what the officers could and could not go into, and by informing appellant he was inclined to let the officers say they recognized appellant from prior contact with him but that anything more presented a problem that would have to be discussed.

In short, the adverse ruling to which appellant was referring was the granting of his motion in limine. The trial court gave no definitive [*10] ruling regarding the admissibility of the extraneous bad acts, although until the facts were further developed, he was inclined to keep them out. Even the prosecutor acknowledged that the extraneous bad acts became relevant only if appellant challenged the legality of the entry, and, on this record, we do not know if appellant's strategy was to challenge that entry. Appellant was charged with resisting arrest. *Tex. Penal Code Ann. § 38.03(a)* (West 2011). The unlawfulness of an arrest or search is not a defense to resisting arrest. *Tex. Penal Code Ann. § 38.03(b)*.

On the other hand, appellant may have had a self-defense defense. The use of force to resist an arrest or search is justified if, before the actor offers any resistance, the peace officer uses or attempts to use greater force than necessary to make the arrest or search and, further, to the degree the actor reasonably believed the force was immediately necessary to protect himself from the police officer's use or attempted use of excessive force. *Tex. Penal Code Ann. § 9.31(c)* (West 2011). Shortly after ruling on the motions in limine, the trial judge made statements anticipating this defense. The prosecutor addressed this defense at length during her voir dire. Appellant did not, but he may have deemed it unnecessary [*11] given the prosecutor's voir dire. Without knowing the strength of the State's case or of appellant's defense, the trial court could only speculate on the effect any of his rulings had on the parties. We are not persuaded that by granting appellant's motion in limine and by tentatively ruling to keep out the prior disturbance, the trial court would have been compelled to conclude the State, through its investigator, deliberately engaged in a strategy of brinkmanship and perjury to avoid a Class A misdemeanor acquittal. *Tex. Penal Code Ann. § 38.03(c), (d)*.

**(2) Was the misconduct repeated despite the trial court's admonitions?**

Regarding whether the misconduct was repeated after the trial court admonished the State to stop, there is nothing in the record suggesting either the prosecutor or Cavinder repeatedly engaged in any misconduct in defiance of the trial court's admonitions to the contrary. The evidence was just the opposite. Cavinder made one mistake, Cavinder brought the mistake to the prosecutor's attention promptly, and the prosecutor immediately took the matter up with the court.

**(3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?**

Cavinder gave a reasonable, good faith explanation [*12] for the conduct. Cavinder said he left the courtroom before the jury was seated. This suggested he left after knowing the jury's composition. Inasmuch as Cavinder appears to have helped with the jury selection, it makes sense he would wait to learn who was on the jury before leaving. When Cavinder made this statement, no one balked at this assertion. The trial judge did not ask follow-up questions suggesting his recollection was different. Similarly, defense counsel, who was presumably present whenever Cavinder left the courtroom, declined to cross-examine Cavinder. About fifty days later, appellant's wife testified that her recollection was that Cavinder did not leave until the jurors themselves left. The trial court could have discounted her recollection. It could have questioned how closely she focused her attention on Cavinder during voir dire, and it could have

concluded that although she could honestly say she thought Cavinder left along with the jurors, her recollection was mistaken.

Cavinder also said he mistook Juror Number Three for Veniremember Fifteen. Once again, no one balked or asserted such a mistake was preposterous. Just the opposite, the trial judge said, "I completely [*13] believe that he believed he was speaking to [Veniremember Fifteen]." Additionally, we note the trial judge excused the jury around three o'clock in the afternoon. Cavinder could have assumed the case would have proceeded directly to opening statements and the initial witnesses and, therefore, could have assumed anyone in the hall when he returned would not have been a juror and, under the circumstances, most likely would have been one of the excused veniremembers. Additionally, Juror Number Three did not attach her jury badge prominently near her collar but, instead, attached it to her purse, which, in accord with Cavinder's testimony, was apparently hanging at her side. Cavinder may have anticipated the juror badge being more prominently displayed near the collar and, not seeing one, assumed the woman to whom he was talking was not a juror. Finally, Juror Number Three was apparently convinced that Cavinder was not initially aware she was a selected juror. Whatever the explanation, the trial judge stated on the record he thought it was an honest mistake, and the record supports such a finding.

**(4) Was the conduct "clearly erroneous"?**

**(5) Was there a legally or factually plausible basis [*14] for the conduct despite its impropriety?**

**(6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?**

Cavinder's conduct was admittedly improper, but there was, as explained above, a factually plausible basis for his conduct. Both Cavinder and Juror Number Three agreed Cavinder was mistaken about her status as a juror. Once alerted to the misconduct, the prosecutor promptly brought the matter to the trial court's attention. The trial court could have seen this as some sort of fraud on the court to goad appellant into moving for a mistrial when it was otherwise clear appellant was well on his way to an acquittal, or the trial court could have seen this as Cavinder making an honest mistake, Cavinder recognizing the gravity of the mistake, Cavinder promptly bringing the mistake to the prosecutor's attention, and the prosecutor responsibly bringing the matter to the court's attention to address on the merits, thereby ensuring appellant had a fair trial. The former construction is problematic even on a cold record. The trial court's ruling is consistent with the latter construction, and the latter construction [*15] is supported by the record.

Reviewing the evidence in the light most favorable to the trial court's ruling, we find no abuse of discretion. *See Bennett, 245 S.W.3d at 618, 620.* We affirm the denial of appellant's application.

/s/ Anne Gardner

ANNE GARDNER

JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED: January 8, 2015

**DISSENT BY:** LEE ANN DAUPHINOT

**DISSENT**

**DISSENTING OPINION**

I must respectfully dissent from the majority opinion because I believe appellate courts are obligated to admit that the emperor is wearing no clothes, no matter how popular the emperor might be.

Unlike trial judges, who primarily see only the conduct in the courtrooms over which they preside, appellate courts are presented with records from other courts in that county as well as other courts in other counties within that appellate district. Appellate judges are in a better position than trial judges to see patterns of conduct. Consequently, appellate judges have an obligation to speak up when observed patterns show a course of conduct at odds with constitutional mandates and fundamental fairness.

The trial court granted Appellant Byrias Roberson's motion for mistrial as a result of a conversation between the prosecutor's [*16] investigator and a member of the jury after jeopardy had attached. After a second prosecution began, Appellant filed his application for writ of habeas corpus in the trial court, alleging that denial of habeas corpus relief would result in double jeopardy. In his prayer, Appellant asked the trial court to grant his application, issue the writ, conduct a hearing on the merits prior to trial, grant relief discharging him from restraint, and dismiss the prosecution.

The trial court set the matter for hearing on its merits, issued a ruling denying relief after the hearing, and certified Appellant's right to appeal.

The majority holds that the record supports the trial court's conclusion that Investigator Donnie Cavinder made an honest mistake. Respectfully, although the Texas Court of Criminal Appeals has abandoned *Bauder*[1] and returned to a standard requiring proof that the prosecution intended to cause a mistrial,[2] when the record shows such a total disregard for rules of trial and pretrial conduct that mistrial is mandated, it is difficult to understand how an objective observer can conclude that such conduct can be called "just an honest mistake." At some point, appellate courts must hold [*17] that the conduct is so egregious that the party cannot avoid its consequences.

1   *Ex parte Bauder, 974 S.W.2d 729 (Tex. Crim. App. 1998), overruled by Ex parte Lewis, 219 S.W.3d 335, 371 (Tex. 2007).*
2   *Francis v. State, 428 S.W.3d 850, 855 (Tex. Crim. App. 2014).*

Appellant made appropriate pretrial requests to discover prior acts of misconduct that the State intended to use. No such discovery was provided by the State. Then Appellant filed motions in limine regarding extraneous acts of misconduct. The trial court heard the motions the day voir dire began. The prosecutor admitted that she anticipated

> testimony in this case regarding the officer's entry into the home. If defense counsel intends to challenge the legality of that entry, I would like the opportunity to question some of the State's witnesses regarding a prior encounter between the defendant and these witnesses about and regarding a disturbance call. He had barricaded himself and his family inside his home. The SWAT team was called to get him out of the home. Two of the members of the SWAT team are witnesses in this case. This prior incident between the defendant and these officers is important for several reasons. It goes to their familiarity with the defendant, their ability to identify him on the date of the offense. It's part of how they recognized him on the date of the offense. It also [*18] goes to their state of mind on the date of the offense, goes to why gang task force officers were asked to serve these warrants on the defendant, and also goes to their reason to believe that the defendant lived in this particular residence.

When the trial court asked for his response, defense counsel replied, "Well, Your Honor, we've asked or requested notice of any bad acts or convictions, and we haven't received any of those." The record reflects that Appellant had requested that notice at least as early as September 2012. His motion in limine was heard August 21, 2013. The trial judge responded,

> Well, let's do it this way. I'll go ahead and sustain or grant on this limine that y'all will approach, and then we would get into exactly what the officers could or could not go into. Without hearing them, I'd be inclined to say they might have had previous contact or something like that that's how they recognized. But to go any further might be a problem. But we'll discuss that. So I'll go ahead and grant that limine on that ground. Make sure you come up before you start with them.

The lawyers selected the jury, and the jury was seated and sworn and heard Appellant plead not guilty before [*19] the trial judge adjourned the proceedings and released the jury.

Cavinder was present in the courtroom during voir dire but claimed that he left the courtroom before the jury was seated. The record reflects that the trial judge gave the following instruction to the venire during the time Cavinder said he was in the courtroom:

> To avoid looking like you are friendly with one side of the case, do not mingle or talk with the lawyers, the witnesses, the parties, or any other person who might be connected with or interested in the case. Do not remain within the hearing of anyone who might be discussing the case. These persons have to follow these same instructions as you . . . .

Cavinder was introduced to the venire as the investigator for the prosecution.

Both the State and the defense agree that Cavinder went personally to the judge, along with the prosecutors, to inform the judge that he had spoken with a juror, Eileen Vale. Both Cavinder and Vale testified about their encounter. Both agreed that Cavinder had approached Vale in the hallway outside the courtroom. That is, it was an intentional encounter on Cavinder's part, and it was not caused by anyone else's actions. Cavinder testified [*20] that he believed that Vale was a member of the

venire who had been released from jury service, a Ms. Steele.

The record, however, clearly shows that Steele was not released from jury service until Vale was sworn as a juror. Steele was not excused for cause or for any other reason. She was released only because she was not chosen as a juror. It was only the seating of the jury that showed Steele's release. Cavinder could not have known Steele was released without also knowing that Vale had been seated as a juror. Indeed, when each side had submitted its strikes, the trial judge seated each juror by name. When he reached Vale, he called her name and then asked if he had pronounced it correctly. That is, Vale was singled out by name. Then the trial judge said,

> If each member of the jury will please stand and raise their right hand for me.
>
> (The jury was sworn)
>
> All right. Thank you. Be seated, please. All right. That's our lucky six. For everybody else who's here on the panel, I spoke with the district clerk, and me releasing you here today here in just a couple minutes will end your service for the week. . . .
>
> . . . .
>
> (Remaining jury panel exits courtroom)

Vale informed Cavinder that he was mistaken [*21] about her identity, and he appeared to recognize his error. According to both Vale and Cavinder, they continued to speak, even after he realized that she was not Steele. That is, Cavinder continued his conversation with juror Vale after realizing and admitting that she was not the venire member who had been excused. They agreed that he spoke with her about her game warden experience. Vale, however, disagreed with Cavinder's representation that he did not discuss the case at bar. Specifically, Vale testified,

> JUROR VALE: From what I remember, he--he kind of made a comment about--I'm trying to--because I was heading down the stairs and he was telling me and then saying about--I'm trying to remember. Let me just--I just said it was okay, but we stopped the conversation right there because he didn't realize that at point I was a juror, a selected juror, I guess.

> THE COURT: You don't remember? We just have to be very specific.
>
> JUROR VALE: I know.
>
> THE COURT: Because it pertains to this case.
>
> JUROR VALE: Right.
>
> THE COURT: *You're sure his question or comment pertained to this particular case?*
>
> JUROR VALE: He just said--uh, I think he said, "*You were struck, but then we got you on*" or something, or something [*22] *to that effect,* which I think--which I think--it didn't--I mean, to me, it didn't--I kinda said, okay, whatever. I'm going to leave right now. [Emphasis added.]

Clearly, Vale believed that Cavinder was talking about the case at bar when he said that she had been struck but "we" managed to get her "back on." It is difficult to understand how Vale could have believed anything else. And it is difficult to understand why Cavinder would have told a venire member who had been excused that she had been struck but "we" managed to get her "back on."

The conscientious trial judge, who can only be commended for his handling of this situation, was concerned about the appearance of impropriety:

> What I'm dealing with now is something that would--whether there was any--and I'm not saying there was any intention on it; I'm not saying who said what. However, what remains is the appearance. And the appearance that there was in her, at least in her mind, from her testimony--I mean that's--[DEFENSE COUNSEL] stated correctly. That's exactly what I heard.
>
> And I want both sides to have a fair trial. And with *that appearance that there was some influence with regard to that juror, I am left with no option except granting* [*23] *a mistrial. There is no way it can be remedied.* And I--I know y'all have--we have been through a rough day yesterday. And I apologize that that work is for naught. And I'm not casting fault on Investigator Cavinder at all. I un-

derstand that was an honest mistake. I completely believe that he believed he was speaking to Ms. Steele.

However, it's that appearance that we just cannot get by in this matter. So for that reason, I'm going to grant a mistrial. Now, we'll talk later whether double jeopardy has attached. I don't think it has . . . . [Emphasis added.]

He had no alternative but to grant a mistrial. The positive result of the mistrial for the State was that its notice of intent to use extraneous acts of misconduct against Appellant became timely and those extraneous acts became admissible.

The rule is well established that the knowledge of one part of the prosecution team is imputed to all members of the prosecution team.[3]

> 3  *Ex parte Adams, 768 S.W.2d 281, 291-92 (Tex. Crim. App. 1989)* (holding that "as a part of the investigating team [the Dallas police officer's] knowledge of [the witness's] lack of identification at the lineup and his assistance to her" was imputed to the prosecutor); *see also Rubalcado v. State, 424 S.W.3d 560, 574 (Tex. Crim. App. 2014)* (imputing knowledge of one county's law enforcement [*24] to the law enforcement of another county).

The prosecutors were aware that the venire member with whom Cavinder improperly spoke had been sworn as a juror. The record casts doubt on Cavinder's testimony concerning his own knowledge. The trial judge singled Vale out when swearing in the jury, asking if he had pronounced her name correctly. Further, the record shows that Vale was chosen and sworn as a juror before Steele was released with the other members of the venire who were not chosen for the jury. It is therefore difficult to understand how Cavinder could have known that Steele was not chosen as a juror but did not know that Vale was selected as a juror.

The Vale's testimony concerning the improper conversation with Cavinder also indicated his awareness that she had been chosen as a juror. Specifically, she stated that he had told her that she had been struck but had also told her, "[T]hen we got you on." Even Cavinder admitted that he continued to speak with her after he realized that she was not the venire member who had been released from jury service. If we give total deference to the determinations of the trial judge, we must conclude that when Cavinder first approached Vale, he believed [*25] that she was Steele. If he was aware that Steele had not

been chosen for the jury, he had to be aware that Vale was, either as a result of his own observation or as a result of the imputed knowledge of the prosecuting attorneys. By his own admission, he remembered that Vale was the one who had gone to game warden school. Yet he continued to speak with her.

After hearing only Cavinder's admissions, the trial judge did not yet believe that there was reason to declare a mistrial. After hearing Vale's testimony, however, he concluded that the trial could not continue. Implicitly, the trial judge believed her testimony, including the statement that Cavinder told her that she had been struck, but "we got you on."

Given the record before us, it is impossible to conclude that Cavinder was unaware that Vale had been chosen for the jury at the time they spoke and he realized she was not Steele. This knowledge means that there is no justification for the conversation. The mistrial was caused by an improper communication by a member of the prosecution team with a juror. The trial judge properly granted the mistrial because of the influence of that conversation on a juror. For the same reason, the [*26] trial judge should have granted Appellant's requested habeas relief.

The prosecution did not provide mandated discovery to the defense. The trial judge ruled that the notice of extraneous acts of misconduct that the State intended to offer into evidence was untimely and that the evidence, presumably, were inadmissible. Perhaps the decision to withhold discovery was a trial tactic. If so, failing to comply with discovery mandated by rule, statute, or court order renders that evidence inadmissible at trial. The Texas Court of Criminal Appeals has held

> *Rule 404(b)* literally conditions the admissibility of other-crimes evidence on the State's compliance with the notice provision of *Rule 404(b)*. . . .
>
> Since the notice requirement of *Rule 404(b)* is a rule of evidence admissibility, then it is error to admit *Rule 404(b)* evidence when the State has not complied with the notice provision of *Rule 404(b)*.[4]

> 4  *Hernandez v. State, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005).*

When the trial judge suggested that would be his ruling, the State clearly benefitted from the mistrial caused by Cavinder's actions. That is, the time delay be-

tween the mistrial and future trial setting erased the notice and admissibility issues.

Case law instructs us that double jeopardy prohibitions bar retrial when the prosecution intends to cause [*27] a mistrial.[5] The *Masonheimer* court held that the prosecution's hiding of *Brady* material to avoid an acquittal was sufficiently egregious conduct to bar retrial after the trial court was forced to grant a mistrial because this prosecutorial misconduct was discovered.[6]

> 5   *Ex parte Masonheimer*, 220 S.W.3d 494, 509 n.21 (Tex. Crim. App. 2007).
> 6   *Id.* at 507-08.

Case law does not explain how we are to determine motive when it is an investigator and not prosecutors who commits the misconduct, and misconduct it certainly was. There are only two reasons an experienced investigator would tell a member of the jury that she had been struck but the prosecution had managed to get her back onto the jury: either he was attempting to cause a mistrial or he was attempting to deprive the defendant of a fair trial by an impartial jury. In light of the fact that the State had failed to disclose prior bad acts it fully intended to use at trial, despite Appellant's timely request for disclosure, and in light of the trial court's statement that those bad acts would probably not be admitted before the jury because of the failure to disclose them, it is impossible to say that the mistrial did not benefit the State.

The conscious decision of the State to withhold such mandated discovery is particularly [*28] disturbing in light of its similar decisions in *Dabney v. State*,[7] *Pitman v. State*,[8] and *Juarez v. State*.[9]

> 7   No. 02-12-00530-CR, 2014 Tex. App. LEXIS 11496, 2014 WL 5307178, at *7-9 (Tex. App.--Fort Worth Oct. 16, 2014, pet. filed) (mem. op., not designated for publication).
> 8   372 S.W.3d 261, 268-70 (Tex. App.--Fort Worth 2012, pet. ref'd).
> 9   No. 02-08-00167-CR, 2009 Tex. App. LEXIS 3942, 2009 WL 1564926, at *1 & n.2 (Tex. App.--Fort Worth June 4, 2009, no pet.) (mem. op., not designated for publication).

To hold that retrial is not barred by double jeopardy is to condone and encourage such conduct. We have an obligation to both the bench and the bar to hold, as the trial court did when granting the mistrial, that ignoring court-ordered or statutorily- or rule-mandated discovery is not acceptable trial strategy. I would therefore reverse the order of the trial court denying habeas relief and remand this cause to the trial court with instructions to grant Appellant's requested habeas relief and enter an order of dismissal. Because the majority does not, I respectfully dissent.

/s/ Lee Ann Dauphinot

LEE ANN DAUPHINOT

JUSTICE

PUBLISH

DELIVERED: January 8, 2015



# Texas
# Constitution

**Includes Amendments Through
the November 4, 2014,
Constitutional Amendment Election**

EXHIBIT A-1

trial or other court proceedings, denied release on bail if following a hearing a judge or magistrate in this state determines by a preponderance of the evidence that the person violated the order or engaged in the conduct constituting the offense. (Added Nov. 6, 2007.)

**Sec. 12. HABEAS CORPUS.** The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual.

**Sec. 13. EXCESSIVE BAIL OR FINES; CRUEL AND UNUSUAL PUNISHMENT; REMEDY BY DUE COURSE OF LAW.** Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

**Sec. 14. DOUBLE JEOPARDY.** No person, for the same offense, shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction.

**Sec. 15. RIGHT OF TRIAL BY JURY.** The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. Provided, that the Legislature may provide for the temporary commitment, for observation and/or treatment, of mentally ill persons not charged with a criminal offense, for a period of time not to exceed ninety (90) days, by order of the County Court without the necessity of a trial by jury. (Amended Aug. 24, 1935.)

**Sec. 15-a. COMMITMENT OF PERSONS OF UNSOUND MIND.** No person shall be committed as a person of unsound mind except on competent medical or psychiatric testimony. The Legislature may enact all laws necessary to provide for the trial, adjudication of insanity and commitment of persons of unsound mind and to provide for a method of appeal from judgments rendered in such cases. Such laws may provide for a waiver of trial by jury, in cases where the person under inquiry has not been charged with the commission of a criminal offense, by the concurrence of the person under inquiry, or his next of kin, and an attorney ad litem appointed by a judge of either the County or Probate Court of the county where the trial is being held, and shall provide for a method of service of notice of such trial upon the person under inquiry and of his right to demand a trial by jury. (Added Nov. 6, 1956.)

**Sec. 16. BILLS OF ATTAINDER; EX POST FACTO OR RETROACTIVE LAWS; IMPAIRING OBLIGATION OF CONTRACTS.** No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.

**Sec. 17. TAKING, DAMAGING, OR DESTROYING PROPERTY FOR PUBLIC USE; SPECIAL PRIVILEGES AND IMMUNITIES; CONTROL OF PRIVILEGES AND FRANCHISES.** (a) No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person, and only if the taking, damage, or destruction is for:

(1) the ownership, use, and enjoyment of the property, notwithstanding an incidental use, by:

EXHIBIT

# CONSTITUTION

OF THE

# STATE OF TEXAS,

ADOPTED BY THE

## CONSTITUTIONAL CONVENTION,

BEGUN AND HELD AT

## AT THE CITY OF AUSTIN,

ON THE

## Sixth day of September, 1875.

---

OFFICIAL

---

GALVESTON:
PRINTED AT THE "NEWS" BOOK AND JOB ESTABLISHMENT.

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

EXHIBIT B-1

# CONSTITUTION OF THE STATE OF TEXAS.

## PREAMBLE.

Humbly invoking the blessing of Almighty God, the people of the State of Texas do ordain and establish this Constitution.

## ARTICLE I.
### Bill of Rights.

That the general, great and essential principles of liberty and free government may be recognized and established, we declare:

SECTION 1. Texas is a free and independent State, subject only to the Constitution of the United States; and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government unimpaired to all the States.

SEC. 2. All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.

SEC. 3. All free men when they form a social compact have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

SEC. 4. No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.

SEC. 5. No person shall be disqualified to give evidence in any of the courts of this State on account of his religious opinions, or for the want of any religious belief, but all oaths or affirmations shall be administered in the mode most binding upon the conscience, and shall be taken subject to the pains and penalties of perjury.

SEC. 6. All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

SEC. 7. No money shall be appropriated or drawn from the treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes.

SEC. 8. Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right to determine the law and the facts under the direction of the court, as in other cases.

SEC. 9. The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation.

SEC. 10. In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel or both; shall be confronted with the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor. And no person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine, or imprisonment otherwise than in the penitentiary, in cases of impeachment, and in cases arising in the army or navy, or in the militia, when in actual service in time of war or public danger.

SEC. 11. All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law.

SEC. 12. The writ of *habeas corpus* is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual.

SEC. 13. Excessive bail shall not be

80398

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law.

SEC. 14. No person, for the same offense, shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction.

SEC. 15. The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.

SEC. 16. No bill of attainder, *ex post facto* law, retroactive law, or any law impairing the obligation of contracts, shall be made.

SEC. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the Legislature or created under its authority shall be subject to the control thereof.

SEC. 18. No person shall ever be imprisoned for debt.

SEC. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

SEC. 20. No citizen shall be outlawed; nor shall any person be transported out of the State for any offense committed within the same.

SEC. 21. No conviction shall work corruption of blood, or forfeiture of estate; and the estates of those who destroy their own lives shall descend or vest as in case of natural death.

SEC. 22. Treason against the State shall consist only in levying war against it, or adhering to its enemies, giving them aid and comfort; and no person shall be convicted of treason except on the testimony of two witnesses to the same overt act, or on confession in open court.

SEC. 23. Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime.

SEC. 24. The military shall at all times be subordinate to the civil authority.

SEC. 25. No soldier shall in time of peace be quartered in the house of any citizen without the consent of the owner, nor in time of war but in a manner prescribed by law.

SEC. 26. Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed; nor shall the law of primogeniture or entailments ever be in force in this State.

SEC. 27. The citizens shall have the right, in a peaceable manner, to assemble together for their common good, and apply to those invested with the power of government for redress of grievances or other purposes, by petition, address or remonstrance.

SEC. 28. No power of suspending laws in this State shall be exercised except by the Legislature.

SEC. 29. To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

## ARTICLE II.
### The Powers of Government.

SECTION 1. The powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

## ARTICLE III.
### Legislative Department.

SECTION 1. The legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled "The Legislature of the State of Texas."

SEC. 2. The Senate shall consist of thirty-one members, and shall never be increased above this number. The House of Representatives shall consist of ninety-three members until the first apportionment after the adoption of this Constitution, when, or at any apportionment thereafter, the number of representatives may be increased by the Legislature, upon the ratio of not more than one representative for every fifteen thousand inhabitants, *provided*, the number of representatives shall never exceed one hundred and fifty.

SEC. 3. The senators shall be chosen by the qualified electors for the term of four years; but a new Senate shall be chosen after every apportionment, and the senators elected after each apportionment shall be divided by lot into two classes. The seats of the senators of the first class shall be vacated at the expiration of the first two years, and those of the second class at the expiration of four years, so that one-half of the senators shall be chosen biennially thereafter.

SEC. 4. The members of the House of Representatives shall be chosen by the qualified electors, and their term of office shall be two years from the day of their election.

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

EXHIBIT B-3

# THE

# LAWS OF TEXAS

## 1822-1897

Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Independence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the same by Texas; Constitution of the United States; Constitutions of the State of Texas, with all the Laws, General and Special, passed thereunder, including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress.

COMPILED AND ARRANGED BY

## H. P. N. GAMMEL
OF AUSTIN.

WITH AN INTRODUCTION BY C. W. RAINES.

## VOLUME VIII.

40564

AUSTIN:
THE GAMMEL BOOK COMPANY.
1898

EXHIBIT C-1

# CONTENTS.

|  |  | Page |
|---|---|---|
| Fourteenth Legislature, Regular Session, General Laws, 1874 | | 1 |
| Fourteenth Legislature, Regular Session, Special Laws, 1874, | | 265 |
| Fourteenth Legislature, Second Session, General Laws, 1875, | | 371 |
| Fourteenth Legislature, Second Session, Special Laws, 1875, | | 589 |
| Ordinances of the Constitutional Convention, 1875 | | 751 |
| Constitution of the State of Texas, 1875 | | 779 |
| Fifteenth Legislature, Regular Session, General Laws, 1876, | | 835 |
| Fifteenth Legislature, Regular Session, Special Laws, 1876, | | 1185 |
| Sixteenth Legislature, Regular Session, General Laws, 1879, | | 1299 |

EXHIBIT C-2

# CONSTITUTION

## OF THE

# THE STATE OF TEXAS

### ADOPTED BY THE

## CONSTITUTIONAL CONVENTION

CONVENED AT AUSTIN, SEPTEMBER 6, 1875, AND
RATIFIED BY THE PEOPLE
FEBRUARY 15, 1876.

———————

HOUSTON
1876

EXHIBIT C-3

arising in the army or navy, or in the militia, when in actual service in time of war or public danger.

Sec. 11. All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law.

Sec. 12. The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual.

Sec. 13. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law.

Sec. 14. No person, for the same offense, shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction.

Sec. 15. The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.

Sec. 16. No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.

Sec. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the Legislature or created under its authority shall be subject to the control thereof.

Sec. 18. No person shall ever be imprisoned for debt.

Sec. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Sec. 20. No person shall be outlawed; nor shall any person be transported out of the State for any offense committed within the same.

Sec. 21. No conviction shall work corruption of blood, or forfeiture of estate; and the estates of those who destroy their own lives shall descend or vest as in case of natural death.

Sec. 22. Treason against the State shall consist only in

EXHIBIT C-4